UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

IN THE MATTER OF:

The Search of the Premises Known As
1406 N. 2nd Avenue, Iron River, MI 49935,
_____/

Case No. 2:05-mj-28

HON. TIMOTHY P. GREELEY

**OPINION AND ORDER**

On or about August 18, 2005, an FBI Agent presented an application for a search warrant and affidavit in support to the undersigned for consideration. The Court declined to sign the proposed warrant and the FBI agent presented an application and amended affidavit on August 31, 2005. In the opinion of the undersigned, the proposed affidavit established probable cause to believe that child pornography might be found on the computer or computers located at the residence the FBI sought to search. The search warrant request sought authority to seize all computers located at the residence. After the seizure of the computers, the warrant sought the authority to search those computers for all evidence of child pornography. Unlike the typical search warrant, this warrant sought to seize property before the property was searched. The proposed warrant did not establish any time limit for the Government to search the computers, nor did it establish a protocol for searching the computers that were seized. According to the Government, it could not set forth a time period for searching the computers "because of the uncertainties and the complexity of the examination." *See* Government's Motion to Withdraw Order of August 31, 2005, at page 4.

On August 31, 2005, the Court granted the request for a search warrant and issued a separate Order stating:

> IT IS HEREBY ORDERED that within 30 days of execution of the Search Warrant issued on August 31, 2005, a return shall be presented to the Court. The return shall identify all computer storage media, such as hard drives, CDs, DVDs, floppy disks, the variety of USB drives or thumb drives, or other forms of storage media seized, as well as all other materials seized from the residence. No forensics examination of the computer hard drive and storage media may be conducted of the materials seized until further order of this Court. At the time the return is presented to the Court, the Government shall provide an estimate of the time necessary to conduct a forensics examination of the materials seized and the computer search protocol to be utilized.

After the search of the residence was conducted, Heath Condon was indicted on September 7, 2005, with distributing material involving the sexual exploitation of a minor and possession of child pornography. Heath Condon appeared before the Court on September 8, 2005, with appointed counsel. At that time, the Government made a motion to dismiss the Indictment without prejudice. The motion was granted. Thereafter, the Government initiated separate civil forfeiture proceedings against the computer and other material seized from the residence, maintaining that those items were subject to forfeiture as instrumentalities of the offense of possessing and distributing child pornography. *See United States of America v. One Dell Computer Tower, et al.*, Case No. 2:05-cv-249. On September 30, 2005, the Government filed a search warrant return . That return indicated that it would take 60 to 90 days to conduct the search of the seized computer and related digital media.

Thereafter, the Government filed a Motion to Withdraw Order of August 31, 2005 (Docket #15). The Government maintains in that motion:

> The Order has four features: 1) a 30-day deadline for filing the return; 2) the requirement that the Government supply to the Court an estimate of the time necessary to conduct a forensic examination of the materials seized; 3) a ban on searching the seized digital media until further order of the Court; and 4) the requirement that the Government also furnish a "computer search protocol" to this Court.

> The Court should not exercise its supervisory power to issue such an order. In considering the substance of the Order, the timing aspects, items one and two, are moot. The Government filed the return on September 30, 2005, and included with the return was an estimated time for determining whether there is evidence of the offense within the computer and related digital media. As discussed below, requiring a search protocol at this juncture is without technical basis and has little legal support, particularly in the context of this child pornography case where Defendant has admitted that the computer contains child pornography and was an instrumentality of the crime and, therefore, subject to forfeiture.

A hearing was held in this matter on November 22, 2005, and the parties have fully briefed the issues presented. The last brief filed in this matter was on January 25, 2006. As indicated above, the Government has challenged four aspects of the order issued by this Court: 1) the requirement that the Government file a return within 30 days, 2) the request that the Government supply the Court with an estimate of the time necessary to conduct its search of the seized materials, 3) the ban on searching the seized material until further order of the Court, and 4) the requirement that the Government furnish a computer search protocol.

As the Government recognizes, Rule 41(e)(2) of the Federal Rules of Criminal Procedure gives the Court the authority to set a time limit for the execution of the warrant that does not exceed 10 days and to decide whether the warrant can be executed in the daytime or nighttime. When a search warrant is typically issued by the Court, the Government is given the authority to search for contraband or alleged evidence of a crime within a specified period that does not exceed 10 days. The warrant requested in this case sought authority to seize property within the 10-day limit set by Rule 41(e)(2). The requested warrant, however, did not state any time period during which the search of the seized material would be conducted. This would allow the Government to seize all computers and digital media found at the residence, retain that material, and search it at its convenience. When initially presented with the warrant, the Court requested an estimate of the

amount of time necessary to search the computers and/or digital media. The FBI agent informed the Court that it could give no such estimate to the Court. The Court asked the agent whether or not the search would be concluded within a year, and the FBI agent refused to make that assurance.[1]

The affidavit provided to the Court established that the suspect, Heath Condon, was not the only resident at 1406 N. 2nd Avenue, Iron River, Michigan. The proposed warrant requested the authority to seize all computers and digital media located at that residence. The material provided to the Court did not and could not identify how many computers were located at the residence or who those computers belonged to.

As established at the hearing, a home computer can contain a small library of books and other information. At the hearing, the Government presented evidence that suggests a home computer can easily hold 40,000 books. The Court can take judicial notice that home computers can be used to store an individual's private documents, photographs and papers, including marriage certificates, insurance policies, tax documents, bills and receipts, and files of personal correspondence. The warrant requested by the Government sought the authority to seize all the computers located at the residence and an unlimited amount of time to conduct a full search of the computers. As proposed, the warrant would have provided the Government with an unlimited amount of time to search all documents and information contained in all computers seized from the residence. The warrant provided the officers with complete discretion in searching the computers seized pursuant to the warrant.

---

[1] Other agencies have provided the Court with a timeline for conducting computer searches in their warrant request.

An analysis of the Government's authority to search and seize evidence and the Court's authority to issue a warrant begins with the Fourth Amendment. The Fourth Amendment provides that:

> No warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the person or things to be seized.

The particularity requirement applies both to the place to be searched and the person or things to be searched for and seized. The warrant must specifically identify the things to be seized. As the Supreme Court explained in *Stanford v. State of Texas*, 379 U.S. 476 (1965):

> These words are precise and clear. They reflect the determination of those who wrote the Bill of Rights that the people of this new Nation should forever "be secure in their persons, houses, papers, and effects" from intrusion and seizure by officers acting under the unbridled authority of a general warrant. Vivid in the memory of the newly independent Americans were those general warrants known as writs of assistance under which officers of the Crown had so bedeviled the colonists. The hated writs of assistance had given customs officials blanket authority to search where they pleased for goods imported in violation of the British tax laws. They were denounced by James Otis as "the worst instrument of arbitrary power, the most destructive of English liberty, and the fundamental principles of law, that ever was found in an English law book," because they placed "the liberty of every man in the hands of every petty officer." The historic occasion of that denunciation, in 1761 at Boston, has been characterized as "perhaps the most prominent event which inaugurated the resistance of the colonies to the oppressions of the mother country." "Then and there," said John Adams, "then and there was the first scene of the first act of opposition to the arbitrary claims of Great Britain. Then and there the child Independence was born." *Boyd v. United States*, 116 U.S. 616, 625, 6 S.Ct. 524, 529, 29 L.Ed. 746.
>
> But while the Fourth Amendment was most immediately the product of contemporary revulsion against a regime of writs of assistance, its roots go far deeper. Its adoption in the Constitution of this new Nation reflected the culmination in England a few years earlier of a struggle against oppression which had endured for centuries. The story of that struggle has been fully chronicled in the pages of this

- 5 -

Court's reports, and it would be a needless exercise in pedantry to review again the detailed history of the use of general warrants as instruments of oppression from the time of the Tudors, through the Star Chamber, the Long Parliament, the Restoration, and beyond.

What is significant to note is that this history is largely a history of conflict between the Crown and the press. It was in enforcing the laws licensing the publication of literature and, later, in prosecutions for seditious libel that general warrants were systematically used in the sixteenth, seventeenth, and eighteenth centuries. In Tudor England officers of the Crown were given roving commissions to search where they pleased in order to suppress and destroy the literature of dissent, both Catholic and Puritan. In later years warrants were sometimes more specific in content, but they typically authorized of all persons connected of the premises of all persons connected with the publication of a particular libel, or the arrest and seizure of all the papers of a named person thought to be connected with a libel.

It was in the context of the latter kinds of general warrants that the battle for individual liberty and privacy was finally won--in the landmark cases of *Wilkes v. Wood* and *Entick v. Carrington*. The Wilkes case arose out of the Crown's attempt to stifle a publication called The North Briton, anonymously published by John Wilkes, then a member of Parliament-- particularly issue No. 45 of that journal. Lord Halifax, as Secretary of State, issued a warrant ordering four of the King's messengers "to make strict and diligent search for the authors, printers, and publishers of a seditious and treasonable paper, entitled, The North Briton, No. 45, * * * and them, or any of them, having found, to apprehend and seize, together with their papers." "Armed with their roving commission, they set forth in quest of unknown offenders; and unable to take evidence, listened to rumors, idle tales, and curious guesses. They held in their hands the liberty of every man whom they were pleased to suspect." Holding that this was "a ridiculous warrant against the whole English nation," the Court of Common Pleas awarded Wilkes damages against the Secretary of State. John Entick was the author of a publication called Monitor or British Freeholder. A warrant was issued specifically naming him and that publication, and authorizing his arrest for seditious libel and the seizure of his "books and papers." The King's messengers executing the warrant ransacked Entick's home for four hours and carted away quantities of his books and papers. In an opinion which this Court has characterized as a wellspring of the rights now protected by the Fourth Amendment, Lord Camden declared the warrant to be unlawful. "This power," he said, "so

- 6 -

assumed by the secretary of state is an execution upon all the party's papers, in the first instance. His house is rifled; his most valuable secrets are taken out of his possession, before the paper for which he is charged is found to be criminal by any competent jurisdiction, and before he is convicted either of writing, publishing, or being concerned in the paper." *Entick v. Carrington*. Thereafter, the House of Commons passed two resolutions condemning general warrants, the first limiting its condemnation to their use in cases of libel, and the second condemning their use generally.

This is the history which prompted the Court less than four years ago to remark that "(t)he use by government of the power of search and seizure as an adjunct to a system for the suppression of objectionable publications is not new." *Marcus v. Search Warrant*, 367 U.S. 717, at 724, 81 S.Ct. 1708, at 1712. "This history was, of course, part of the intellectual matrix within which our own constitutional fabric was shaped. The bill of Rights was fashioned against the background of knowledge that unrestricted power of search and seizure could also be an instrument for stifling liberty of expression." *Id.*, at 729, 81 S.Ct. at 1715. As MR. JUSTICE DOUGLAS has put it, "The commands of our First Amendment (*485 as well as the prohibitions of the Fourth and the Fifth) reflect the teachings of *Entick v. Carrington, supra*. These three amendments are indeed closely related, safeguarding not only privacy and protection against self-incrimination but 'conscience and human dignity and freedom of expression as well." *Frank v. Maryland*, 359 U.S. 360, 376, 79 S.Ct. 804, 814 (dissenting opinion).

In short, what this history indispensably teaches is that the constitutional requirement that warrants must particularly describe the "things to be seized" is to be accorded the most scrupulous exactitude when the "things" are books, and the basis for their seizure is the ideas which they contain. *See Marcus v. Search Warrant*, 367 U.S. 717, 81 S.Ct. 1708, 6 L.Ed.2d 1127; *A Quantity of Copies of Books v. Kansas*, 378 U.S. 205, 84 S.Ct. 1723, 12 L.Ed.2d 809. No less a standard could be faithful to First Amendment freedoms. The constitutional impossibility of leaving the protection of those freedoms to the whim of the officers charged with executing the warrant is dramatically underscored by what the officers saw fit to seize under the warrant in this case.

"The requirement that warrants shall particularly describe the things to be seized makes general searches under them impossible and prevents the seizure of one thing under a warrant describing another. As to what is to be taken, nothing is left to the discretion of the

- 7 -

> officer executing the warrant." *Marron v. United States*, 275 U.S. 192, at 196, 48 S.Ct. 74, at 76. We need not decide in the present case whether the description of the things to be seized would have been too generalized to pass constitutional muster, had the things been weapons, narcotics or "cases of whiskey." *See Steele v. United States No. 1*, 267 U.S. 498, 504, 45 S.Ct. 414, 416, 69 L.Ed. 757. The point is that it was not any contraband of that kind which was ordered to be seized, but literary material--"books, records, pamphlets, cards, receipts, lists, memoranda, pictures, recordings and other written instruments concerning the Communist Party of Texas, and the operations of the Communist Party in Texas." The indiscriminate sweep of that language is constitutionally intolerable. To hold otherwise would be false to the terms of the Fourth Amendment, false to its meaning, and false to its history.

*Id*. at 481-486.

The Court was concerned that issuing the requested warrant would provide the Government with a general warrant allowing it to search all information in all computers seized from the residence to be searched. There was probable cause to believe that Heath Condon possessed a computer at that residence that might contain evidence of violation of the laws regarding child pornography. Other computers owned by other individuals who lived at that residence would also be subject to seizure and search by the Government. The proposed warrant established no protocol to limit the search of computers seized.[2] The Court entered its order requiring the Government to make a return within 30 days to identify the number of computers which were seized. If more than one computer was seized, the Court was concerned regarding the legitimacy of a broad search of those computers. The Court was concerned that allowing the Government to seize all computers at the residence and keep them for an unstated period of time was an unreasonable search. The warrant request allowed the Government to seize all computers at the residence. This authorized the

---

[2] If multiple computers were seized, the Government could have used a prescran disk to search for images of child pornography. If images of child pornography were found on a computer, a more thorough search could have been conducted of that computer.

Government to seize the equivalent of hundreds of thousands of pages of documents. Furthermore, the Court was concerned that without a time limit, the proposed warrant was an unreasonable seizure and search which could authorize the Government to seize the private documents of individuals living at the residence for an unreasonable period of time.

In an effort to address these concerns, the Court requested that a return be provided to the Court identifying the number of computers seized pursuant to the warrant. This would allow the Court to consider whether or not further limits needed to be placed on search protocol to ensure that the Government's search was limited to the documents or materials authorized by the warrant. In addition, the Court felt that the Government would be in a better position to indicate how long it needed to search the materials seized after it knew how many computers were seized. This proved to be true for in the return provided to the Court, the Court was notified that only one computer was seized and that the Government needed 60 to 90 days to search that computer. The return also indicated that Heath Condon confessed that he had viewed child pornography on the computer and that there were images of child pornography stored on the computer.

The Government's primary objection appears to be to the requirement that it provide a search protocol.[3] The Government does recognize that this Court has the supervisory power in criminal matters "to implement a remedy for violation of recognized rights; to preserve judicial integrity by ensuring that a conviction rests upon appropriate consideration validly before the jury; and, finally, as a remedy designed to deter illegal conduct." *United States v. Hasting*, 461 U.S. 499 (1983). According to the Government, "ordinarily the judiciary should not interfere with the conduct

---

[3]The Government's argument that a search protocol should never be required appears disingenuous, particularly since the Department of Justice manual, <u>Searching and Seizing Computers and Obtaining Electronic Evidence in Criminal Investigations</u>, July 2002, encourages that search warrant requests include an explanation of the search methodology.

- 9 -

of a criminal investigation by the executive branch." *See* Government's Motion to Withdraw Order of August 31, 2005, at page 10. It is the Court's obligation in reviewing a request for a search warrant to ensure compliance with the Fourth Amendment. The Government has argued strenuously that Fourth Amendment violations which occur during a search conducted pursuant to a warrant should be addressed after the search is conducted. The Court concludes that it has an obligation to issue a warrant that does not violate an individual's Fourth Amendment rights. As the Government recognizes, "every search is unique and unpredictable." *Id*. at page 11. The Government also indicates, "the Court would never consider a search protocol for a home or a vehicle." *Id.* Because every search is unique and unpredictable, the Court is not prepared to indicate that it would never consider a search protocol for a home or vehicle, particularly if the Government came to the Court requesting that a home be seized for an unlimited amount of time or that a vehicle be seized for an unlimited amount of time so that the Government could conduct its search at its leisure. This Court recognizes that searching a computer presents technical difficulties which justifies the seizure of the computer for examination at a later point off-site. *See Guest v. Leis*, 255 F.3d 325, 335 (6th Cir. 2001). As the Court recognized in *United States v. Carey*, 172 F.3d 1268 (10th Cir. 1999), "the storage capacity of computers requires a special approach." *Id.* at 1275, n. 7. The Court in *Carey* urged the use of software and a search method that avoided searching files not identified in the warrant. The Court's opinion in *Carey* recognizes that each case may be unique and that different facts might produce different results when judging the validity of a search. A search protocol for searching a computer was required in *In re 3817 W. West End*, 321 F.Supp.2d 953 (N.D. Ill. 2004).

Based on the foregoing, the Court concludes that in the instant case, based on the return presented on September 30, 2005, the Government need not provide a search protocol.[4] Therefore, the Court will withdraw that aspect of its order of August 31, 2005. In all other respects, the Government's motion (Docket #15) is denied. The Government will be permitted to search the computer seized and the digital media evidence and is hereby ordered to conclude that search within 90 days of the date of this opinion and order.

IT IS SO ORDERED.

 /s/ Timothy P. Greeley
TIMOTHY P. GREELEY
UNITED STATES MAGISTRATE JUDGE

Dated:   March 17, 2006

---

[4] The Court does not hold that a search protocol may not be required in another case.

- 11 -